**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CAPITAL LIGHTING AND SUPPLY, LLC, | * | |
| Plaintiff, | * | |
| v. | * | CIVIL NO. JKB-17-3765 |
| KENNETH L. WIRTZ, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Capital Lighting and Supply, LLC, d/b/a Capital Tristate ("Plaintiff"), filed a thirty-one count, ninety-nine page Complaint against thirteen defendants: Kenneth L. Wirtz, Kristen R. Wirtz, TK Lighting Supply, LLC ("TK Lighting"), MEKW, LLC ("MEKW"), Todd Sibel, Sibel Sales Inc. ("Sibel Sales"), Adam J. Harmon, AXIS LED Group, LLC ("AXIS"), Volturno Solutions, LLC ("Volturno"), JC Sons, LLC ("JC Sons"), Baltimore's Light Source, LLC ("BLS"), Jeffrey D. Smith, and Christine A. Smith (collectively "Defendants"). The Complaint alleges that various groupings of Defendants created and operated criminal enterprises designed to defraud Plaintiff of millions of dollars over a roughly five-year period. Specifically, the Complaint alleges that the defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 15 U.S.C. § 1961 *et seq.* In addition, Plaintiff asserts a host of state common law causes of action, including breach of the duty of loyalty, fraud, constructive fraud, negligence, conversion, unjust enrichment, money had and received, tortious interference with contractual relationships, conspiracy, aiding and abetting, and breach of contract. The defendants have filed four separate motions to dismiss (ECF Nos. 32, 33, 35, and 36), which are

now ripe. The motions have been briefed (ECF Nos. 32-1, 33-1, 35-1, 36-1, 37, 38, 39, 40, and 41) and no hearing is required, *see* Local Rule 105.6 (D. Md. 2016). For the reasons set forth below, Defendants' Motions will be DENIED IN PART and GRANTED IN PART.

## I. *Background*

Plaintiff, Capital Tristate, is an electrical distributor. It provides "electrical products, lighting, and services to contractors, builders, and end-users in Maryland, Pennsylvania, West Virginia, [the] District of Columbia, and Virginia." (Compl., ECF No. 1 ¶ 5.) Defendant Kenneth Wirtz was employed by plaintiff as an Account Manager in its Energy & Maintenance Service ("EMS) division from August 14, 2006, through April 12, 2017. (*Id.* ¶ 32.) The EMS division "provides a suite of products and services including consultation, lighting supplies, and project management for electrical and lighting energy-efficiency projects to property owners and others." (*Id.* ¶ 24.) The EMS division provides design and analysis services for clients and also "often acts as the general contractor for those projects." (*Id.* ¶ 27.) Plaintiff often employs subcontractors on its jobs and also purchases products and materials from electrical suppliers.

Defendants, with the exception of Mr. Wirtz, are individuals and corporate entities that served as subcontractors and/or suppliers for Plaintiff's EMS division projects. Defendants can generally be divided into four groups; however, there is significant overlap between the various groups.

### A. *The Wirtz Defendants*

This group of Defendants consists of Mr. Wirtz, his wife Kristen Wirtz, TK Lighting, and MEKW. As an Account manager in Plaintiff's EMS division, Mr. Wirtz:

> (a) obtained new customer leads, (b) interfaced with potential new customers regarding their retrofitting and lighting needs, (c) managed the bid process, including assisting with developing the cost analysis and ultimate price to charge the customer, (d) was the point-person on the job, interfacing with the customer

and the subcontractors, (e) instructed other CapitalTristate employees on the type and quantity of products to purchase for each job, (f) handled product inventory, (g) retained and oversaw subcontractors and suppliers, (h) reviewed and approved subcontractor and supplier invoices, and (i) instructed other CapitalTristate employees to approve invoices and to apply credits to various accounts.

(*Id.* ¶ 35.)  Mr. Wirtz's wife, Kristen Wirtz, is the sole owner of MEKW and the co-owner, along with defendant Todd Sibel, of TK Lighting.  (*Id.* ¶ 7.)  Defendant MEKW is a Pennsylvania limited liability company that was formed by Mrs. Wirtz on November 7, 2014.  (*Id.* ¶ 9.)  Defendant TK Lighting is a Maryland limited liability company that is "owned and operated by Defendants Todd Sibel and Kristen Wirtz, and is in the business of selling lighting supplies to businesses and acting as a general contractor on retrofitting projects."  (*Id.* ¶ 8.)

### B.  The Sibel Defendants

Defendant Todd Sibel is "an energy management solutions expert" based in Pikesville, Maryland.  (*Id.* ¶ 10, 33.)  In addition to co-owning TK Lighting with Mrs. Wirtz, Mr. Sibel is the sole owner of Defendants Sibel Sales and Volturno.  (*Id.* ¶ 11–12.)  Defendant Sibel Sales's scope of work is unclear from the Complaint; however, it appears to be a subcontractor (or possibly a lighting supplier) frequently used by Plaintiff.  Defendant Volturno "provides sales and consulting services for energy efficiency in commercial real estate."  (*Id.* ¶ 12.)  Sibel Sales and Volturno both appear to have been approved subcontractors/suppliers used by Plaintiff on its EMS projects.

### C.  The AXIS Defendants

Defendant AXIS is a limited liability company registered in both Maryland and Ohio that supplies lighting products to contractors, including Plaintiff.  (*Id.* ¶ 14.)  Defendant Adam Harmon is "the National Director, Senior Account Manager, and agent of Defendant AXIS."  (*Id.* ¶ 74.)

### D. The Smith Defendants

The Smith Defendants include Jeffrey and Christine Smith, a married couple living in Glen Burnie, Maryland. (*Id.* ¶ 15–18.) The Smiths own two companies that provide electrical contracting services. (*Id.*) Those companies are Defendant JC Sons and Defendant Baltimore's Light Source. (*Id.*) Both JC Sons and Baltimore's Light Source provided electrical contracting services for Plaintiff's EMS division. (*Id.*)

### E. Allegations in the Complaint

Plaintiff's Complaint, which is laid out over ninety-nine pages and 464 paragraphs, describes multiple schemes orchestrated by Defendants in order to defraud Plaintiff of millions of dollars. In essence, Kenneth Wirtz used his position of authority within Plaintiff's EMS division to orchestrate a series of overbilling, over ordering, and kickback schemes with the other Defendants who provided services and supplies to Plaintiff. These schemes were primarily orchestrated by Kenneth Wirtz, Kristen Wirtz, and Todd Sibel, although the Smith Defendants also played a critical role.

The apparent initial scheme, repeated many times, was rather straightforward. Mr. Wirtz, with the assistance of Mr. Sibel, would secure EMS retrofit projects for Plaintiff. After Plaintiff was hired by a client to execute a retrofit project, Mr. Wirtz would hire JC Sons, his "preferred electrical contractor," to perform the work. Mr. Wirtz and Mr. Sibel would then discuss how much to overbill Plaintiff for supplies and services needed for the project. One of the two would then instruct the Smith Defendants to submit JC Sons' invoices for the work to Volturno, an entity wholly owned and controlled by Mr. Sibel. Subsequently, Mr. Sibel would significantly inflate the amount of the invoice and submit it to Plaintiff through his other company, Sibel Sales. Mr. Wirtz would then approve payment of the invoice (or instruct others to approve

payment), knowing that it was inflated. In addition to inflating real invoices from JC Sons, Mr. Wirtz, Mr. Sibel, and the Smiths would also create wholly fake invoices from JC Sons and Baltimore's Light Source.[1] The Wirtzs and Mr. Sibel would then divide the excess money between themselves, funneling it through TK Lighting and MEKW to conceal their fraudulent scheme. (*Id.* ¶¶ 45–71.)

The Smiths did not receive any of the excess money obtained from the *inflated* invoices. They did, however, receive money from the *fake* invoices. The Smiths retained money from payments made by Plaintiff to JC Sons and Baltimore's Light Source that referenced invoice numbers they knew to be fraudulent. At Mr. Wirtz's instruction, the Smith's would retain a portion of this money and apply it to older, valid and outstanding invoices they had sent to Plaintiff. The Smiths would then provide the remainder of the money to Mr. Sibel or Mr. Wirtz by leaving a personal check made out to one of them in the Smiths' mailbox. The Smith, Wirtz, and Sibel Defendants also submitted fake invoices as credits to Plaintiffs in an attempt to conceal from Plaintiff just how much money it was losing through its EMS division. The inflated and fake invoice scheme involving the Wirtz, Sibel, and Smith Defendants began sometime in 2014 and lasted through Mr. Wirtz's termination in 2017. (*Id.* ¶¶ 97–117, 118–121.)

In addition to the invoice schemes, the Wirtz, Sibel, and Smith Defendants caused Plaintiff to order an excessive amount of product for retrofit projects and then used the excess product on TK Lighting, JC Sons, and Baltimore's Light Source projects. TK Lighting, JC Sons, and Baltimore's Light Source did not pay for these products and therefore received a windfall at Plaintiff's expense when they were paid by their customers. (*Id.* ¶¶ 146–53.)

---

[1]     Defendants shifted to using Baltimore's Light Source, another company owned by the Smiths, in June or July of 2016 because Plaintiff "had stopped paying JC Sons' invoices on June 15, 2016" due to an excessive number of credits applied to JC Sons' accounts receivable within Plaintiff's accounting system. These credits were allegedly fraudulently created by Mr. Wirtz and Mr. Sibel and applied to JC Sons' account in an effort to conceal the amount of money that Plaintiff was unwittingly paying to JC Sons. (ECF No. 1 ¶¶ 122–27.)

The fraudulent scheme involving the AXIS defendants appears to have been simpler. Defendants Mr. Wirtz, Mr. Sibel, and Mr. Harmon created an inflated price list for AXIS products "typically used and purchased by Capital Tristate for the EMS division's retrofit projects." (*Id.* ¶ 76.) Mr. Wirtz then distributed this inflated price list to his colleagues within the EMS division, knowing full well that it contained an additional markup that he would personally profit from. After Plaintiff purchased products from AXIS at these inflated prices, AXIS would pay TK Lighting—the company owned by Todd Sibel and Kristen Wirtz—five percent of the total product price plus fifty percent of the additional markup amount. Defendant Harmon allegedly retained the other fifty percent of the additional markup amount. This scheme began in the summer of 2015 and continued through Mr. Wirtz's termination in 2017.[2]

The Wirtzs and Mr. Sibel also carried out a number of schemes that did not involve their other codefendants. For example, beginning in 2014 and continuing through August 2016, Sibel Sales would submit fake credits to Plaintiff. (*Id.* ¶¶ 133–37.) Mr. Wirtz would then instruct other Capital Tristate employees "to use the Sibel Sales credits to clear accounts receivables on various jobs." (*Id.* ¶ 135.) This was done to forestall Plaintiff from discovering how much money the EMS division was losing as a result of Defendants' fraudulent schemes. In another scheme, the Wirtzs and Mr. Sibel would instruct Plaintiff's customers to pay TK Lighting rather than Capital Tristate for work. TK Lighting would then bill the customers and receive payment from them while Plaintiff paid for all of the materials and labor on the job and received no payment.[3] (*Id.* ¶¶ 138–45.)

---

[2] Plaintiff also identifies one instance in which it over ordered products from the AXIS Defendants. Plaintiff indicates that "Defendants knowingly ordered excess product from AXIS for an EMS project," but does not identify which specific Defendants did so. (*Id.* ¶¶ 93–95.)

[3] It is not clear from the Complaint who actually performed the work for these customers (TK Lighting, JC Sons, or perhaps another lighting contractor), but Plaintiff alleges that it footed the entire cost and received no payment from the customer.

Finally, Mr. Wirtz also profited individually at Plaintiff's expense. First, Mr. Wirtz performed labor for Sibel Sales on non-Capital Tristate projects during regular business. Thus, according to the Complaint, Mr. Wirtz was being paid for purported labor with money Sibel Sales fraudulently obtained from Plaintiff at the same time he was employed full time by and receiving a salary from Plaintiff. (*Id.* ¶ 65.) Second, as part of his employment agreement with Plaintiff, Mr. Wirtz was entitled to commissions on all of his sales. Mr. Wirtz allegedly concealed the losses his various schemes caused Plaintiff, which allowed him to receive "approximately $500,000 more in commissions than he was entitled to receive." (*Id.* ¶¶ 154–59.)

In October 2016, Plaintiff was alerted to possible accounting issues in its EMS division and initiated an internal review and audit of the division. Through its ongoing investigation, Plaintiff has identified approximately $6 million of losses, "most, if not all, of [which] can be traced back to retrofit projects coordinated by, or otherwise involving, Defendant Ken Wirtz, in concert and coordination with the other named Defendants in this Complaint." (*Id.* ¶ 42.)

## II.    *Standard for Dismissal under Rule 12(b)(6)*

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* An inference of a "mere possibility of misconduct" is not sufficient to support a plausible claim. *Id.* at 679. However, "a well–pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556. Even so, "[f]actual allegations must be enough to raise

a right to relief above the speculative level." *Id*. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

To state a claim for fraud, a plaintiff must do more. Rule 9(b) states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The "circumstances constituting fraud or mistake" include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobil Corp*., 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

## III. Analysis

Each Defendant has filed a separate motion to dismiss; however, all make the same fundamental argument: Defendants may have engaged in fraud they say, but their alleged criminal activity does not rise to the level of a RICO violation. While largely focusing on the adequacy, or lack thereof, of the RICO counts, most Defendants also challenge the adequacy of several of the state common law claims raised by Plaintiff. As explained in detail below, the Court disagrees with Defendants on most fronts. At least as to Counts One and Four, the Complaint describes a closely aligned group of individuals and companies, who carried out multiple, related schemes, over a significant period of time. In other words, it describes an enterprise that engaged in a pattern of racketeering activity. The same cannot be said of the other RICO counts, however, and therefore they will be dismissed. The Court also concludes that Plaintiff has plausibly alleged its state law claims.

### A. RICO Claims

RICO provides a civil private right of action to "[a]ny person injured in his business or property" by a substantive violation of the statute. 18 U.S.C. § 1964(c). A prevailing plaintiff in a RICO civil action "is entitled to treble damages, costs and attorney's fees." *Friedler v. Cole*, No. CIV.A. CCB-04-1983, 2005 WL 465089, at *7 (D. Md. Feb. 28, 2005). A plaintiff seeking civil damages under RICO must plausibly allege four elements to state a claim: "(1) conduct [causing injury to business or property], (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Company, Inc.*, 473 U.S. 479, 496 (1995). Racketeering activity is defined under 18 U.S.C. § 1961(1), and includes certain felony acts "chargeable" under state law as well as any act that is "indictable" under specific listed provisions of the federal criminal code, including mail (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

The AXIS and Sibel Defendants contend that Plaintiff fails to adequately plead facts in support of the second and third element—enterprise and pattern—while the other Defendants argue that Plaintiff's claims fail as to all four RICO elements. The Court begins with the pattern element because it is largely dispositive.

### i. Pattern of Racketeering Activity

A "pattern of racketeering activity" is statutorily defined and "requires at least two acts of racketeering activity, . . . the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). To prove a pattern, a plaintiff is required to show that the predicate acts "are [1] related *and* [2] that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Acts are related if they "have the same or similar

purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241; *accord Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683–84 (4th Cir. 1989) ("[P]redicate acts must be part of a prolonged criminal endeavor.").

"Courts have struggled to balance the statute's directive that it 'be liberally construed to effectuate its remedial purposes,' with the need to limit its severe penalties to offenders engaged in ongoing criminal activity, rather than isolated wrongdoers." *Friedler*, 2005 WL 465089, at *7 (quoting Pub. L. 91–452, § 904(a), 84 Stat. 941, 947)). For instance, the Fourth Circuit has frequently noted the "distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Al–Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). And it has opined that RICO liability should be reserved for cases involving "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being."[4] *Menasco*, 886 F.2d at 684 (quoting *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987)). On the other hand, the Circuit has also given significant weight to "Congress' express admonition that the RICO statute 'be liberally construed to effectuate its remedial purposes.'" *Brandenburg v. Seidel*, 859 F.2d 1179, 1194 (4th Cir. 1988) (quoting Pub. L. 91–452, § 904(a), 84 Stat. 941, 947), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996).

---

[4]     Defendants latch on to these platitudes, arguing that their alleged conduct was merely *ordinary* fraud and did not pose *a threat to society*. But what separates "ordinary" or "garden-variety" fraud from extraordinary fraud? When does fraud rise from the normal to the abnormal such that it poses a "special threat to social well-being"? An answer remains elusive—both from Defendants and the Fourth Circuit. These generalizations, without more, quickly devolve into an unsatisfying, and unprincipled, "I know it when I see it" analysis.

In the wake of the Supreme Court's decision in *Sedima*,[5] circuit courts took varying approaches to the RICO pattern requirement—some focused exclusively on the number of predicate acts, others focused on the complexity and scope of the criminal scheme(s), and still others adopted a more holistic view.

> The Eighth Circuit held that several related instances of mail or wire fraud in pursuit of one continuing fraudulent scheme cannot amount to a pattern. *See Superior Oil v. Fulmer*, 785 F.2d 252 (8th Cir.1986). The Second and Eleventh Circuits have continued to emphasize the number of predicate offenses. *United States v. Ianniello*, 808 F.2d 184 (2d Cir. 1986); *Bank of America v. Touche Ross & Co.*, 782 F.2d 966 (11th Cir. 1986). The Seventh Circuit held that the existence of a pattern must be determined with regard to all the circumstances of a case, rather than an isolated factor or set of factors. *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir. 1986).

*HMK Corp. v. Walsey*, 828 F.2d 1071, 1073 (4th Cir. 1987).[6]

The Fourth Circuit has adopted a "flexible," *Brandenburg*, 859 F.2d at 1185, approach to the pattern inquiry—embracing a case-by-case analysis that "looks to the 'criminal dimension and degree' of the alleged misconduct." *HMK Corp.*, 828 F.2d at 1073 (quoting *Zepkin*, 812 F.2d at 155); *see Zepkin*, 812 F.2d at 155 ("[N]o mechanical test can determine the existence of a RICO pattern."); *Brandenburg*, 859 F.2d at 1185 (noting that pattern element depends on "all the facts and circumstances of the particular case—with special attention to the context in which the predicate acts occur"). "Factors relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg*, 859 F.2d at 1185. No one factor is dispositive, nor is the list exhaustive. The

---

[5]    In *Sedima*, the Court clarified that while two racketeering acts are necessary to form a pattern, they *may* not be sufficient to do so.

[6]    The Second Circuit subsequently abrogated *Ianniello*, abandoning its narrow focus on the number of predicate acts in favor of a more holistic, case-by-case analysis similar to that followed by the Fourth and Seventh Circuits. *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989).

existence of *many* predicate acts in furtherance of a single scheme does not necessarily constitute a RICO pattern. *See Zepkin*, 812 F.2d at 155 ("The number of predicate acts is not an appropriate litmus test, as the perpetration of numerous acts of mail and wire fraud 'may be no indication of the requisite continuity of the underlying fraudulent scheme.'" (quoting *Lipin Enterprises v. Lee*, 803 F.2d 322, 325 (7th Cir. 1986) (Cudahy, J., concurring)). On the other hand, the mere fact that the predicate acts were all in furtherance of a *single* scheme or directed at a *single* victim does not automatically foreclose RICO liability. *See Al-Abood*, 217 F.3d at 238 ("no per se rule against a RICO claim involving only one victim"); *Brandenburg*, 859 F.2d at 1185 (existence of single scheme not dispositive).

In short, to constitute a pattern, the predicate racketeering acts "must be related and must be part of a continuous criminal endeavor." *Zepkin*, 812 F.2d at 154. "RICO is not 'aimed at the isolated offender.'" *Id.* at 155 (quoting *Sedima*, 473 U.S. at 496 n.14). Rather, "[t]he pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes." *Id.* (quoting *Lipin Enterprises*, 803 F.2d at 324).

### 1. Counts One and Four

In Counts One and Four, Plaintiff alleges a substantive RICO claim and RICO conspiracy claim, respectively, against Defendants Ken Wirtz, Kristen Wirtz, Todd Sibel, Sibel Sales, MEKW, TK Lighting, JC Sons, Baltimore's Light Source, Jeffrey Smith, and Christine Smith. The Court is convinced that the allegations in the Complaint sufficiently describe a pattern of racketeering activity by these Defendants. The Complaint describes in great detail a years' long concerted effort by these Defendants to defraud Plaintiff of millions of dollars. Defendants

engaged in repeated, ongoing racketeering activity and employed an assortment of different schemes to carry out and conceal their alleged illegal conduct.

First, all of the predicate racketeering acts alleged in the above counts of the Complaint were related. The acts had the same purpose: to enrich Defendants by defrauding Capital Tristate's EMS division through overbilling, over ordering, and other means and to conceal Defendants' fraudulent activities. They had the same results: Defendants successfully siphoned millions of dollars out of Plaintiff's EMS division and into their own pockets. They had the same participants: The Wirtzs, the Smiths, Mr. Sibel, and their various companies all participated in the vast majority of the predicate acts. Although the Smiths arguably played a lesser role, their acquiescence to and active participation in the predicate acts was critical to the enterprise's success. The predicate acts all had the same victim, namely Capital Tristate. And finally, the predicate acts all had the same or similar methods of commission: Defendants used an inside man—Mr. Wirtz—to approve inflated and fake invoices and to order excess products that could be resold or used by Defendants. Defendants then distributed the profits from their fraudulent schemes to each other though their various corporate entities. Moreover, Defendants used similar methods to cover their tracks: Mr. Wirtz approved credits to the accounts of the same companies that were stealing from his employer in order to conceal Defendants' conduct and preserve the enterprise.

Second, Defendants conduct was continuous and ongoing. Defendants' conduct was not limited in dimension, degree, or duration. Defendants' conduct, although now ceased, was open-ended in nature. There was no clear endpoint to Defendants' various schemes and, had they not been caught, their criminal conduct likely would have continued "into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Indeed, even if Defendants' conduct were viewed as a

closed-ended scheme, its alleged four-year duration represents the type of long-term criminal conduct that RICO was designed to target. Moreover, although the Complaint primarily alleges only mail and wire fraud, it does not describe a "garden-variety," single scheme that happened to "enlist the mails and wires in its service at least twice," *Zepkin*, 812 F.2d at 154–55. On the contrary, the Complaint alleges a host of schemes that evolved over time to increase Defendants' returns and to avoid detection.

Defendants' conduct appears to have started as a rather straightforward overbilling kickback scheme and, had it stopped there, perhaps Plaintiff's RICO claims would be unsustainable. It did not stop there, however. In addition to inflating invoices and creating fake invoices, Defendants routed invoices and payments through multiple shell companies to obscure their fraud. Moreover, Defendants submitted tens of thousands of dollars in fraudulent credits to Plaintiff, which Mr. Wirtz approved, in order to conceal their scheme. Amazingly, Defendants seem to have convinced Plaintiff that its EMS division was profitable for a period of time when in fact it was hemorrhaging money to Defendants. Defendants also evolved over time to preserve their enterprise. For instance, when Plaintiff stopped approving payments to JC Sons because of the excessive number of credits it had in the accounting system, Defendants evolved and came up with a solution to keep their scheme going. Mr. Wirtz was able to get Baltimore's Light Source—the other company owned by the Smith Defendants—approved as a vendor for Plaintiff. Defendants then picked up where they left off, only with Baltimore's Light Source in place of JC Sons submitting fraudulent invoices.

Defendants also used Plaintiff's EMS division to essentially bankroll their own companies that provided similar and competing services to those provided by Plaintiff. Defendants caused Plaintiff to order excess product and then diverted that material from Plaintiff's jobs to side jobs

Defendants profited from. This resulted in a windfall for Defendants as Plaintiff was unwittingly footing the bill for their materials. Defendants went one step further on at least one occasion (and allegedly more) when they fraudulently induced a third-party to pay TK Lighting the entirety of the fee due Plaintiff for a retrofit project. Indeed, the evolving nature of Defendants' schemes suggests that they had no intention of stopping their racketeering activity and, if anything, they were becoming more brazen. This is exactly the type of ongoing, escalating criminal endeavor that RICO was intended to target.

Defendants contend that Plaintiff's RICO claims fail because there was only a single victim and the predicate acts were largely limited to mail and wire fraud. These arguments are not persuasive. As an initial matter, it is not clear to the Court that this is a single victim case. At least one unnamed client of Plaintiff was allegedly fraudulently induced to pay Defendant TK Lighting tens of thousands of dollars that was actually owed to Plaintiff. This unnamed client (and possibly others) was also a victim of Defendants' fraud. But even assuming Capital Tristate is the only victim, Defendants' arguments ignore the Fourth Circuit's admonition to look at the totality of the circumstances in evaluating the pattern element. "There is no per se rule against a RICO claim involving only one victim." *Al-Abood*, 217 F.3d at 238. Nor is there a per se rule against a RICO claim involving only mail and wire fraud. *Id.* ("[I]t is possible for defendants to be guilty of RICO violations if they commit two or more acts of mail or wire fraud and the acts are sufficiently related and sufficiently continuous.")

True, as Defendants note the Fourth Circuit has urged caution when evaluating RICO claims based solely on predicate acts of mail and wire fraud. *See, e.g.*, *id.* This warning makes sense. Almost any fraud, no matter how "ordinary" or isolated, will "enlist the mails and wires in its service at least twice," *Zepkin*, 812 F.2d at 154–55. Accordingly, mail and wire fraud

provide an enticing hook for plaintiffs hoping to avail themselves of RICO's lucrative treble damages. Courts should rightly be cautious of such claims. But that does not mean that courts should hastily dismiss any RICO claim premised on mail and wire fraud. It is one thing to approach such claims cautiously, but it is quite another to preclude all RICO claims based on mail and wire fraud as Defendants seem to suggest. Indeed, the current case is a prime example of how related and continuous acts of mail and wire fraud may appropriately be asserted as the basis for a RICO claim.

Defendants cite a number of Fourth Circuit cases that rejected RICO claims based on mail and/or wire fraud. However, most of these cases involved only a single scheme to defraud the plaintiff, and therefore are not analogous to the multiple and varied schemes allegedly carried out by Defendants here.

For instance, in *Flip Mortgage Corporation v. McElhone*, the defendant and plaintiff entered into an agreement whereby the defendant would distribute a mutually developed product and then provide 70% of the revenue obtained from customers to the plaintiff. 841 F.2d 531, 533 (4th Cir. 1988). The plaintiff discovered that "for years [the defendant] had not accounted for all receipts each month, and by this means it had deprived [the plaintiff] of substantial income." *Id*. Despite the duration of the fraud and the repeated distinct injuries suffered by the plaintiff, all of which were attributable to predicate acts of mail fraud, the Fourth Circuit found there was no pattern of racketeering activity because the acts were all part of a "single scheme." *Id.* at 538.

Likewise, in *Zepkin*, the Fourth Circuit rejected the plaintiff's RICO claims based on an allegedly misleading prospectus. The RICO hook was that this single prospectus had been distributed to ten investors via the mails. The Fourth Circuit found that the distribution of a single misleading prospectus to ten investors did not constitute a RICO "pattern." The court held

that such a "single, limited scheme" was not what Congress envisioned when it created RICO to "serve as a weapon against ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." 812 F.2d at 155.

Finally, the same is true of *Al-Abood*, another case heavily cited by Defendants. *Al-Abood*, is closer to the current case in that it involved "three distinct schemes spanning several years" carried out against a single plaintiff. 217 F.3d at 238. The defendants, a mother and son, had convinced the plaintiff, a wealthy widower, to make several investments with them, all of which turned out to be fraudulent. Despite the duration of the defendants' conduct and the multiple schemes they employed, the Fourth Circuit found that there was no RICO pattern in light of "the narrow focus of the scheme," which was "essentially a dispute between formerly close family friends." *Id.*

Here, however, the scope, duration, and degree of Defendants' conduct mandates a different result. Defendants did not engage in a single scheme to defraud Plaintiff. Nor is this a narrow dispute between former family friends. Rather, the Complaint alleges a pattern of racketeering activity: Specifically, a years' long endeavor by *multiple* individuals and companies, using *multiple* schemes to infiltrate, corrupt, and profit from an otherwise *legitimate business*. Put simply, Defendants allegedly turned an entire division of Plaintiff's company into their own personal piggy bank. This type of extensive, ongoing, commercial fraud falls squarely within the purview of RICO's pattern requirement.

## 2. *Counts Two and Five*

The RICO allegations involving the AXIS Defendants paint a different picture, however. Indeed, juxtaposed against the allegations in Counts One and Four, those in Counts Two and

Five provide the perfect example of the type of "ordinary" or "garden-variety" fraud that should not be placed under the RICO umbrella.[7]

Plaintiff alleges that Adam Harmon, a national account manager for AXIS provided Mr. Sibel with a price list and told him, "You can add whatever you want to the cost of it and I will pay you that in commissions once payments are paid in full." (ECF No. 1 ¶ 84.) Mr. Sibel and Mr. Harmon then executed a contract that made TK Lighting an independent contractor for AXIS to facilitate the payment of kickbacks from the additional markup on goods sold to Plaintiff by AXIS. (*Id.* ¶ 86.) Plaintiff alleges that there were subsequently "at least eight" instances over a one-year period in which TK Lighting received a kickback from AXIS based on the additional markup AXIS charged Plaintiff for goods.

These allegations do not describe a pattern of racketeering activity. At best, they describe a single, narrow scheme to defraud Plaintiff through the use of a price list created specifically for Plaintiff. The fact that Plaintiff made multiple purchases from AXIS based on the inflated price list does not change this analysis. Indeed, the AXIS Defendants' alleged conduct aligns almost perfectly with that of the defendants in *Zepkin*, who distributed a single, misleading prospectus to ten different investors. In both instances a single fraudulent document was produced, and the subsequent distribution and use of the document generated multiple instances of alleged mail or wire fraud. This is the quintessential example of a narrow, isolated fraudulent act improperly being converted into a RICO claim based on the incidental use of the mails and wires.[8]

---

[7]     Plaintiff limits Counts Two and Five to the acts described in paragraphs 72–96 and 160–67 of its Complaint. Thus, the alleged pattern of racketeering activity in these Counts is narrowly defined despite these Counts including the same Defendants—namely the Wirtzs and Mr. Sibel—who engaged in a pattern of racketeering activity over the same time period as described in other sections of the Complaint. As explained *infra*, Section III.A.iii., the Court is admittedly perplexed by Plaintiff's decision to allege three separate RICO enterprises made up of many of the same individuals over the same time period.

[8]     Plaintiff also alleges that "Defendants AXIS, Adam Harmon, Todd Sibel, Sibel Sales, Ken Wirtz, Kristin Wirtz, and TK Lighting also ordered and/or caused CapitalTristate to purchase products that were not needed for

18

### 3. Counts Three and Six

Counts Three and Six allege yet another independent RICO enterprise that appears to merely be a subgrouping of the larger enterprise alleged in Counts One and Four. The below chart highlights the areas of similarity and distinction between these Counts.

| | Counts One and Four | Counts Three and Six |
|---|---|---|
| **Defendants Named** | Ken Wirtz<br>Kristen Wirtz<br>Todd Sibel<br>Sibel Sales<br>MEKW<br>TK Lighting<br>JC Sons<br>Baltimore's Light Source<br>Jeffrey Smith<br>Christine Smith | Ken Wirtz<br>Kristen Wirtz<br>Todd Sibel<br>Sibel Sales<br>MEKW<br>Volturno |
| **Applicable Paragraphs of Complaint** | 45–71<br>97–132<br><br>138–53<br>160–67 | 45–71<br><br>133–37<br>160–67 |
| **Overlapping Conduct Alleged** | Todd Sibel and Ken Wirtz inflated JC Sons' invoices and submitted them to Plaintiff through Volturno and Sibel Sales | |
| **Distinct Conduct Alleged** | • Todd Sibel, Ken Wirtz, and the Smiths created and submitted to Plaintiff fake JC Sons (and later Baltimore's Light Source) invoices<br>• Todd Sibel, Ken Wirtz, and the Smiths created and submitted to Plaintiff fake JC Sons credits<br>• TK Lighting billed customers for Plaintiff's jobs<br>• The Wirtz, Sibel, and Smith Defendants caused Plaintiff to order excess product and then | • Ken Wirtz, Todd Sibel, and Sibel Sales created and submitted to Plaintiff fake Sibel Sales credits |

---

CapitalTristate jobs." (ECF No. 1 ¶ 93.) Plaintiff alleges that these "Defendants knowingly ordered excess product from AXIS." (*Id.* ¶ 95.) The allegations describing this over ordering scheme lack the requisite particularity to satisfy Rule 9(b). Moreover, even assuming this scheme was alleged with adequate particularity, it does not reveal a pattern of racketeering activity even when combined with the alleged inflated price list scheme. These narrow schemes, which lasted for a short period of time and involved only ordering products from AXIS, standing alone, do not constitute the type of ongoing, invidious criminal activity that RICO is intended to target.

| | used it on non-Capital Tristate jobs<br>• Ken Wirtz fraudulently obtained commissions by falsifying Plaintiff's accounting records | |
| --- | --- | --- |

The Court is perplexed by Plaintiff's pleading in a number of regards.  First, Volturno is named only in Counts Three and Six, yet all of the conduct involving Volturno is common to Counts One and Four as well.  In other words, Volturno apparently had no involvement in the distinct facts alleged in support of Counts Three and Six but it is named in only those Counts. Second, it is not at all clear to the Court why Counts Three and Six are even necessary.  True, Counts Three and Six allege a smaller enterprise and narrower purported pattern, yet every Defendant named in these Counts is already named in Counts One and Four (with the notable exception of Volturno, the oddity of which the Court has already noted).  These Counts simply describe a separate enterprise and more limited scope of conduct carried out by Defendants at the same time that they were engaged in closely related, broader schemes with each other. Whatever the rationale behind Plaintiff's pleading strategy, the Court must take Plaintiff's allegations as it finds them, and therefore will consider whether the specific conduct alleged in support of Counts Three and Six constitutes a pattern of racketeering activity.

Turning now to that conduct, the Court finds that it does not rise to the level of a pattern of racketeering activity.  The primary allegations made by Plaintiff in support of these Counts are those involving Mr. Wirtz and Mr. Sibel's inflation of JC Sons' invoices.  These allegations describe a single, narrow invoice inflation scheme carried out by Defendants.  As the Court has already noted *supra*, "Defendants' conduct appears to have started as a rather straightforward overbilling kickback scheme and, had it stopped there, perhaps Plaintiff's RICO claims would be

unsustainable." Counts Three and Six present this exact scenario as Plaintiff has largely limited its allegations to Defendants' initial overbilling kickback scheme.

The only additional allegation in support of these Counts is that Sibel Sales submitted, and Ken Wirtz approved, fraudulent credits "to conceal the various fraudulent schemes and the financial losses suffered by CapitalTristate." (ECF No. 27.) To begin, the allegations regarding the Sibel Sales credit scheme are threadbare. Plaintiff does not allege who created and submitted the credits. Nor does Plaintiff allege how Sibel Sales credits were used to clear unrelated accounts receivable. These allegations arguably do not satisfy the heightened pleading requirements for fraud mandated by Rule 9(b).

Moreover, these two isolated schemes, standing alone, are simply "not sufficiently outside the heartland of fraud cases to warrant RICO treatment." *Al-Abood*, 217 F.3d at 238. As with Counts Two and Five of Plaintiff's Complaint, the allegations in Counts Three and Six only serve to further emphasize the unique nature of the claims in Counts One and Four that actually do amount to a pattern of racketeering activity. Counts One and Four describe multiple schemes, including inflated invoices, fake invoices, fake credits, excess product ordering and redistribution, and even fraudulently inducing at least one customer (and allegedly more) to pay TK Lighting for a project it had no involvement in. The stark contrast between the "criminal dimension and degree," *Zepkin*, 812 F.2d at 155, of the conduct described in Counts One and Four and the comparatively narrow, limited schemes described in the other Counts is inescapable. Indeed, it is a double edged sword for Plaintiff: It highlights the validity of some of Plaintiff's RICO claims while highlighting the insufficiency of the others.

Accordingly, because they fail to allege a pattern of racketeering activity, Counts Two, Three, Five, and Six of Plaintiff's Complaint will be dismissed.

### ii. Enterprise

All of the Defendants also challenge the sufficiency of the Complaint as to the enterprise element of RICO. As previously alluded to, Plaintiff's Complaint alleges three distinct association-in-fact enterprises:

- Enterprise 1 – Ken Wirtz, Kristen Wirtz, Todd Sibel, Sibel Sales, MEKW, TK Lighting, JC Sons, Baltimore's Light Source, Jeffrey Smith, and Christine Smith;

- Enterprise 2 – Ken Wirtz, Kristen Wirtz, Todd Sibel, TK Lighting, Adam Harmon, and AXIS; and

- Enterprise 3 – Ken Wirtz, Kristen Wirtz, Todd Sibel, Sibel Sales, Volturno, and MEKW

The Court need only address the first of these alleged enterprises because it has already concluded that the Counts of the Complaint implicating the second and third alleged enterprise fail to state a claim for relief because the allegations do not plausibly allege a pattern of racketeering activity.

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or *group of individuals associated in fact* although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). "[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Such an enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* Although an enterprise must have these basic "structural" elements, it "need not have a *hierarchical* structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods." *Id.* at 948 (emphasis added). Rather,

"an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Id.*

The enterprise element is distinct from the pattern of racketeering activity and therefore "proof of one does not *necessarily* establish the other." *Turkette*, 452 U.S. at 583 (emphasis added). Accordingly, the association must exist "separate and apart from the pattern of racketeering activity in which it engages." *United States v. Tillett*, 763 F.2d 628, 631 (4th Cir. 1985) (quoting *United States v. Griffin*, 660 F.2d 996, 999 (4th Cir. 1981)). An organization that has an "existence beyond that which [i]s necessary to commit the predicate crimes" or "exist[s] in the intervals between" the predicate crimes satisfies this requirement. *Id.* at 632. By contrast, if "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates," this alone would be insufficient "to show that the individuals were members of an enterprise." *Boyle*, 556 U.S. at 947 n.4. That said, an enterprise may be "inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." *Id.* at 947. Indeed, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Id.* (quoting *Turkette*, 452 U.S. at 583).

Here, Plaintiff has more than adequately pleaded that Defendants formed an association-in-fact enterprise. Defendants mistakenly focus on some of the boilerplate language in Plaintiff's specific RICO Counts while ignoring the plethora of very specific facts Plaintiff pleaded throughout its Complaint as to the structure of the enterprise. First, Plaintiff plainly alleges that the enterprise and its members had a "common purpose": "to charge CapitalTristate inflated and illegal fees, to defraud CapitalTristate out of money, property and business . . . and to illegally profit from that activity at the expense of CapitalTristate." (*See, e.g.*, ECF No. 1 ¶ 177.)

Second, Plaintiff has sufficiently alleged that the individual members of the enterprise were related and carried out specific roles in furtherance of the enterprise. Mr. Wirtz played a central role as the inside man at Capital Tristate who was responsible for tipping other Defendants off to projects, ensuring other Defendants were listed as preferred vendors and hired for projects, and approving inflated and fake invoices, among other conduct. His wife, Kristen Wirtz, allegedly formed a company with Todd Sibel. That company, TK Lighting, is a defendant itself. Mr. Sibel is the sole owner of two other Defendant companies—Sibel Sales and Volturno. The Smiths, another husband and wife, were the owners of JC Sons and Baltimore's Light Source, two other Defendants that were critical cogs in the alleged enterprise. The Smiths allegedly depended on Mr. Wirtz and Mr. Sibel for approximately 50% of their business, which includes their legitimate business. Likewise, the Smith's companies were Mr. Wirtz's preferred vendors for the retrofit projects he managed for Plaintiff.

Finally, Defendants were associated with each other for an extended period of time. They worked together for at least four years, if not longer. They were each other's preferred vendors, subcontractors, and contractors. They allegedly shared excess product among themselves. They shared profits. And they even formed business entities together. Although much of this conduct was part of Defendants' alleged pattern of racketeering activity, it is also relevant to the enterprise element. *See, e.g.*, *Boyle*, 556 U.S. at 947 n.4 (noting that an enterprise may be "inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity"). Moreover, Defendants appear to have carried on *legitimate* business with one another in the "intervals between" their alleged illegal conduct. *Tillett*, 763 F.2d at 632. In short, Defendants worked together for many years as "a continuing unit that function[ed] with a common purpose," *Boyle*, 556 U.S. at 946, to enrich themselves and their

businesses, sometimes through legitimate means and sometimes through a pattern of racketeering activity. It is hard to imagine a more related, interconnected group of individuals and entities.

### iii. Conduct

The Wirtz and Smith Defendants also argue that Plaintiff fails to sufficiently plead the conduct element of RICO.

The Court's analysis begins and ends with Defendants mistaken understanding of the conduct element of RICO. Both the Smith and Wirtz Defendants confuse the conduct element with the pattern requirement. Both Defendants cite exclusively to cases addressing whether and when predicate acts of mail and wire fraud constitute a pattern of racketeering activity. And both Defendants suggest that mail/wire fraud is not sufficiently extraordinary to warrant RICO liability. These arguments are misguided and entirely unpersuasive.

The statute makes it unlawful "for any person employed by or associated with [an interstate] enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The conduct element is concerned with an individual's *role* in the enterprise, not the *type* of predicate act (e.g., mail and wire fraud) as Defendants suggest. To "conduct or participate" in the affairs of an enterprise one must "participate[] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184. This standard "only requires an employee who knowingly commits predicate acts to be *generally* under the direction of higher management." *Toucheque v. Price Bros. Co*, 5 F. Supp. 2d 341, 348 (D. Md. 1998).

Here, as alleged in the Complaint, the Wirtz's indisputably directly conducted the enterprise's affairs.  Mr. Wirtz, together with Mr. Sibel, directed the enterprise.  Although one need not be "upper management" to operate an enterprise, Mr. Wirtz was just that.  The same is true of Mrs. Wirtz.  Mrs. Wirtz was the co-owner of TK Lighting, the company that billed at least one of Plaintiff's customers for work done by Plaintiff and the recipient of excess product Defendants caused Plaintiff to unwittingly order.  Moreover, she was the sole owner of MEKW, the company the Wirtz's used to receive and conceal their share of the profits of Defendants' various schemes.  The Wirtz Defendants offer absolutely no relevant argument to the contrary.

Likewise, the Smith Defendants, although not upper management, knowingly committed predicate acts in furtherance of the enterprise at the direction of Mr. Wirtz and Mr. Sibel.  The Smith Defendants received payments for fake JC Sons invoices, retained some of the money and gave the rest to Mr. Wirtz and Mr. Sibel via checks left in their mailbox.  (ECF No. 1 ¶ 102–03, 108–111.)   The Smith Defendants also submitted fraudulent invoices from Baltimore's Light Source to Plaintiff at Mr. Wirtz's direction.  (*Id.* ¶ 125.)  And the Smith Defendants received excess product that had been paid for by Plaintiff and then used that product on JC Sons and Baltimore's Light Source jobs without compensating Plaintiff.  (*Id.* ¶ 151.)  All of the Smith's conduct was carried out pursuant to Mr. Wirtz and Mr. Sibel's instructions in furtherance of the alleged enterprise.  The Smith Defendants, like the Wirtz Defendants, offer no relevant argument to counter these allegations.

**B.    *State Law Claims***

Having resolved Defendants' arguments for dismissal of the federal RICO claims, the Court is left to resolve the remaining twenty-five state law claims brought by Plaintiff.  Because two federal claims have survived, the Court will not dismiss all of the state law claims pursuant to 28

U.S.C. § 1367(c)(3) as requested by Defendants. Defendants also make several specific challenges to certain of the state law claims which the Court will address.

### i. Fraudulent Misrepresentation (Count Nine)

The AXIS Defendants argue that Count Nine, which alleges fraudulent misrepresentation against them and others, has not been pleaded with adequate particularity to satisfy Rule 9(b) and fails to state a claim upon which relief may be granted. The AXIS Defendants' argument is specific to them, and no other Defendant has challenged the adequacy of this Count.

In Maryland, to withstand a motion to dismiss a claim for fraudulent misrepresentation, a plaintiff must plausibly allege that:

(1) the defendant made a false representation to the plaintiff,

(2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth,

(3) the misrepresentation was made for the purpose of defrauding the plaintiff,

(4) the plaintiff relied on the misrepresentation and had the right to rely on it, and

(5) the plaintiff suffered compensable injury as a result of the misrepresentation.

*Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005).

The AXIS Defendants contend that Plaintiff has failed to plead with particularity that they made a false representation. The Court disagrees.[9] Plaintiff's Complaint alleges, *inter alia*, that the AXIS Defendants represented to Plaintiff that the payments for their invoices "were going to . . . AXIS for the payment of the actual costs of the goods and services, rather than a portion of the payment being paid to Ken Wirtz, Todd Sibel, Kristen Wirtz, Sibel Sales, Adam Harmon."

---

[9] The allegedly "inflated price list" provided by AXIS and Adam Harmon to Capital Tristate does not appear to be sufficient *alone* for a fraudulent misrepresentation claim. AXIS may mark up its prices as much as it wants and it is not under any special obligation to disclose the cost of goods. But Plaintiff has alleged more than this. Plaintiff has alleged that the AXIS Defendants affirmatively represented to it that payment was going to AXIS only, when in fact a portion of Plaintiff's payment was going to Adam Harmon, the Wirtzs, and Mr. Sibel.

(ECF No. 1 ¶ 278.) Accordingly, Plaintiff has alleged a false representation with adequate particularity to withstand a motion to dismiss.

### ii. *Aiding and Abetting (Count Twenty-Two)*

Count Twenty-two of the Complaint charges Defendants JC Sons, Jeffrey Smith, and Christine Smith with aiding and abetting the Wirtz and Sibel Defendants in their fraudulent invoicing scheme.

In Maryland, a person may be held liable for aiding and abetting "if he, by any means (words, signs, or motions) encouraged, incited, aided or abetted the act of the direct perpetrator of the tort." *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1049 (Md. 1995) (quoting *Duke v. Feldman*, 226 A.2d 345, 347 (Md. 1967)). "[A]ider and abettor tort liability is predicated upon the wrongdoer's engaging in acts of encouragement or assistance to the person actually committing the wrongful act." *Saadeh v. Saadeh, Inc.*, 819 A.2d 1158, 1171 (Md. Ct. Spec. App. 2003). Accordingly, "[t]o be liable in tort, the aider or abettor must have engaged in assistive conduct that he would know would contribute to the happening of th[e] [tortious] act." *Id.*

The Smith Defendants argue that any assistive conduct on their part was done without knowledge of the underlying tortious conduct by Mr. Wirtz and Mr. Sibel. Plaintiff, however, alleges otherwise. And, at least at this stage of the proceeding, Plaintiff's allegations are entitled to all reasonable inferences. Plaintiff alleges that the Smith Defendants received payments from Plaintiff that referenced invoices they knew did not exist. (ECF No. 1 ¶ 102–03.) Despite believing that the payments were "suspicious or unethical," (*id.* ¶ 112), the Smith Defendants retained a portion of them and applied them to different invoices and then gave the remainder to either Todd Sibel or Kenneth Witrtz via personal checks left in their mailbox. (*Id.* ¶ 109–10.)

Moreover, the Smith Defendants, at Mr. Wirtz's direction, issued Baltimore's Light Source invoices to Plaintiff after Plaintiff stopped paying invoices issued by JC Sons. Plaintiff has plausibly alleged that the Smith Defendants knew this conduct would likely contribute to Mr. Wirtz's ongoing fraud. Indeed, the Smith Defendants seem to have assisted with what they knew was a fraudulent scheme because they were dependent on a continuous revenue stream from Plaintiff via Ken Wirtz. (*Id.* ¶ 112 ("Jeff Smith and I . . . were under the impression that if we did not work with the request of Ken Wirtz and Todd Sibel, that the retrofit jobs they provided us with may stop coming and Capital Lighting & Supply, LLC provides approximately 50% of our annual income.").) In sum, Plaintiff has plausibly alleged that the Smith Defendants were aware that their conduct would contribute to the fraudulent acts of their codefendants.

### iii. Civil Conspiracy Counts (Counts Eighteen through Twenty-One)

The Sibel, Smith, and AXIS Defendants all contend that the civil conspiracy counts alleged in the Complaint should be dismissed because "conspiracy" is not a cause of action in Maryland.

Defendants misunderstand Maryland law. In Maryland, "'conspiracy' is not a separate tort capable of *independently* sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007) (emphasis added). In other words, in Maryland the agreement to commit a tort "is not actionable on its own but rather is in the nature of an aggravating factor." *Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 428 (Md. 2009) (quoting *Hoffman v. Stamper*, 867 A.2d 276, 290 (Md. 2005)). Thus, "[i]n addition to proving an agreement, 'the plaintiff must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury.'" *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014) (quoting *Hoffman*, 867 A.2d at 290); *see also Shenker*, 983 A.2d at 428 ("[A] defendant may not be adjudged liable for civil

conspiracy unless that defendant was legally capable of committing the underlying tort alleged."). But there is no doubt that a plaintiff may plead a conspiracy to commit a tort as an additional cause of action so long as he or she has plausibly alleged that the defendant committed overt acts in furtherance of the conspiracy that caused the plaintiff harm. *See, e.g.*, *id.*

Accordingly, the elements of a civil conspiracy claim in Maryland are: "1) A confederation of two or more persons by agreement or understanding; 2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) Actual legal damage resulting to the plaintiff." *Lloyd*, 916 A.2d at 284 (internal quotations omitted). Here, Plaintiff alleges that various groupings of Defendants "conspire[ed] to defraud and otherwise injure Capital Tristate." (*E.g.*, ECF No. 1 ¶ 366.) Furthermore, Defendants have not challenged the sufficiency of Plaintiff's underlying fraud claims. Therefore, it is undisputed that Defendants did in fact commit overt acts intended to defraud Plaintiff. Nor do Defendants challenge the *sufficiency* of Plaintiff's conspiracy allegations (only whether they may be pleaded at all). Thus, Plaintiff has plausibly alleged that Defendants agreed to defraud Plaintiff, committed tortious acts in furtherance of that agreement, and injured Plaintiff. *Lloyd*, 916 A.2d at 284. Nothing more is required at this stage in the proceeding.

### *iv.* **Respondeat Superior** *Counts (Counts Twenty Three through Twenty-Nine)*

The Sibel, Smith, and AXIS Defendants also argue that *respondeat superior* is not an independent cause of action, and therefore these Counts of the Complaint should be dismissed. Plaintiff concedes this point. The Court agrees. *Gibbons v. Bank of Am. Corp.*, No. CIV. JFM-08-3511, 2012 WL 94569, at *5 n.5 (D. Md. Jan. 11, 2012) ("[*R*]*espondeat superior* is not a standalone claim but a theory of liability under which an employer can be held liable for the

tortious conduct of an employee if the employee was acting within the scope of his employment."); *see Barclay v. Ports Am. Baltimore, Inc.*, 18 A.3d 932, 937 (Md. Ct. Spec. App. 2011) (explaining that *respondeat superior* is a "theory of liability" that "holds an employer vicariously . . . liable for the tortious conduct of an employee, where it has been shown that the employee was acting within the scope of the employment relationship at that time"), *aff'd sub nom. Barclay v. Briscoe*, 47 A.3d 560 (Md. 2012).[10]

## IV. Conclusion

For the foregoing reasons, an Order shall enter DENYING IN PART and GRANTING IN PART the various Defendant's Motions for Summary Judgment (ECF Nos. 32, 33, 35, and 36).

DATED this 20th day of August, 2018.


BY THE COURT:


_____/s/_____
James K. Bredar
Chief Judge

---

[10]    Plaintiff asks that the Court "treat the assertions of *respondeat superior* as simply pleading liability against each Defendant entity for its employees' conduct in Counts I-XXII and XXX-XXXI."  (ECF No. 37, at 35 (citing *Carter v. Maryland*, 2012 WL 6021370, at *11 (D. Md. 2012)).)  Plaintiff named each Defendant entity in the substantive counts for which it attempts to hold them liable.  Defendants have not challenged their *liability* for those substantive counts based on Plaintiff's theory of *respondeat superior*.  Rather, Defendants challenged only Plaintiff's attempt to bring separate causes of action for *respondeat superior*.  In other words, the Defendant entities appear to already be named in every relevant count and Defendants do not challenge the sufficiency of the claims against these entities.